| | |
|---|---|
| INTERFAITH CENTER ON CORPORATE RESPONSIBILITY, UNITED CHURCH FUNDS, and CERES, INC., | |
| Plaintiffs, | Civil Case No. _____ |
| v. | |
| KEN PAXTON, in his official capacity as Attorney General of Texas, | |
| Defendant. | |

## COMPLAINT

1.      Plaintiffs challenge a recently enacted Texas law, Senate Bill 2337 ("SB 2337" or the "Act"), which unconstitutionally chills shareholder advocacy, including research and analysis, that seeks to influence corporate behavior toward long-term value. For two of the three plaintiffs, SB 2337 also chills speech about value-based investing, including investing based on their religious beliefs.

## INTRODUCTION

2.      In enacting SB 2337, the Texas Legislature devised a solution in want of a problem. Institutional investors that partner with organizations to engage in shareholder advocacy and obtain proxy voting information do not require protection from the free flow of such information. But under the pretext of protecting Texas investors, the Legislature passed this law to suppress growing shareholder demands that companies consider important issues that can affect long-term performance. In doing so, SB 2337 attacks shareholder rights that are embedded in the relationship between our democracy and the free-enterprise system.

3.      Central to an investor's rights is the right to invest consistent with one's goals, investment discipline, and values—and to gather information to meet these investment goals. Yet SB 2337 penalizes firms and non-profit organizations for providing this type of information and advice when it is inconsistent with the State's beliefs. The State defines the type of speech it disfavors as "nonfinancial," and requires that organizations that provide so-called "nonfinancial" information and advice publicly pronounce that this information and advice is not "solely in the financial interest of the company's shareholders."

4.      Setting aside the wisdom of SB 2337, the law is indefensible because it violates the Constitution on three levels: first, it restricts speech on the basis of its content and viewpoint without a compelling state interest for doing so; second, it compels private actors to speak against their will and communicate messages reflecting the State's viewpoint; and, third, its vagueness oversteps the limits of due process because, among other things, the Act could be construed to sweep in activity that is not by any objective definition proxy advising.

## SUMMARY OF THE CASE

5.      Plaintiffs are nonprofit organizations that, as part of their missions, partner with institutional investors to engage with companies to seek strong long-term financial performance. As part of seeking that performance, Plaintiffs consider the environmental and social impacts of company practices, as well as strong corporate governance and other factors, because they believe that these factors can be central to the long-term financial success of companies. Those considerations include sustainability and, for two of the Plaintiffs, their religious beliefs.

6.      Plaintiff Interfaith Center on Corporate Responsibility (ICCR) is a coalition of investors who believe their faith or their values should—and as fiduciaries must—guide their investing decisions, including their investment stewardship. Plaintiff United Church Funds (UCF) is a faith-based organization that provides investment services to United Church of Christ (UCC)

churches and other faith-based nonprofit organizations nationwide. Plaintiff Ceres is a nonprofit organization dedicated to the notion that accounting for sustainability is a financial imperative for companies.

7. The State of Texas can disagree with Plaintiffs' view that sustainability-related risks have financial effects on investment portfolios and corporate bottom lines, and Plaintiffs ICCR's and UCF's view that their values and religious beliefs are relevant to investment-related decisions. What it cannot do is compel Plaintiffs to speak in furtherance of Texas's views about these issues. Yet the recently enacted SB 2337 does precisely that.

a) First, SB 2337 divides proxy voting advice into two arbitrary categories that are not used by organizations engaged in proxy advising—advice that is based solely on the financial interest of investors and advice that is based in whole or in part on nonfinancial factors. The Act does nothing to define what "financial interest" of the shareholders means.

b) Second, SB 2337 establishes a definition for "nonfinancial factors" that includes factors that are widely recognized in the financial sector as pertinent to financial interests, such as "environmental, social, or governance (ESG)" goals and "diversity, equity, or inclusion (DEI)." SB 2337 also fails to recognize that the terms "ESG" and "DEI" have a wide variety of meanings and applications to different entities within the investment community and fails to define them in the Act.

c) Third, the Act imposes burdensome disclosure requirements on organizations that render advice that is based to any degree on the consideration of "nonfinancial factors" as defined by the statute. Chief among them, the Act forces Plaintiffs to say something that is both contrary to their core principles and with which they disagree: that environmental and social risks are unrelated to financial interest. These disclosure

requirements will undermine those organizations' credibility with their clients and members, mandate that they disclose detailed financial analyses, and force them to report nonpublic communications with their clients to the companies being evaluated.

d)    Fourth, the Act deems failure to comply with any aspect of SB 2337 as a violation of law that can be pursued by the State, shareholders who did not receive the advice, or the company that is the subject of the advice. Additionally, SB 2337 authorizes the Attorney General to pursue steep penalties—$10,000 per violation—under the Texas Deceptive Trade Practices-Consumer Protection Act for any violation of SB 2337.

8.    This Court has already found that SB 2337 is likely unconstitutional and unenforceable against the two firms that dominate the proxy advisory business: Glass Lewis & Co., LLC (Glass Lewis) and Institutional Shareholder Services, Inc. (ISS). *See Glass Lewis & Co. v. Paxton*, 25-cv-01153 (W.D. Tex. Aug. 29, 2025); *Institutional S'holder Servs., Inc. v. Paxton*, 25-cv-01160 (W.D. Tex. Aug. 29, 2025). But the Act's definitions of "proxy advisor" and "proxy advisory service" sweep much broader than those two firms and include small organizations and non-profits that engage in shareholder advocacy, public education, investing consultation, and investment research. The "proxy advisor" definition does not define "compensation." And the Act's overbroad definition of "proxy advisory service" includes research and analysis (even without recommendations) and generic recommendations (not applied to a particular company). SB 2337 could therefore apply to Plaintiffs and many other organizations like them.

9.    Because SB 2337 is written both so vaguely and so broadly, every application of the Act creates an impermissible risk of the suppression of ideas. Accordingly, Plaintiffs seek declaratory and injunctive relief barring any enforcement of SB 2337.

## PARTIES

10.     Plaintiff Interfaith Center on Corporate Responsibility (ICCR) is a 501(c)(3) non-profit organization chartered in the State of New York. ICCR is a coalition of faith- and values-based investors that engage with corporations as shareholders on the impact of corporate policies and practices on people and the environment, and the risks and opportunities therein, with the goal of enhancing the long-term value of companies. Their membership includes faith communities, asset management companies, pension funds, foundation endowments, and other institutional investors engaging in sustainable investing strategies.

11.     Following their guiding principle "that sustainable corporations must look beyond the next earnings report to account for the full impact of their business on society," ICCR and its members believe that sustainability is integral to the long-term value of a company.

12.     ICCR's membership includes a broad range of both religious and secular organizations concerned with the impacts of corporate practices on people, communities, and the environment, and a collective commitment to bring these concerns to companies through direct, collaborative engagement. Approximately three hundred institutional investors currently belong to ICCR, including asset owners and asset managers holding or managing over $4 trillion in invested capital. These members make both the moral and business case for improved corporate performance along certain metrics, including some metrics that can be characterized as ESG.

13.     ICCR's faith-based members, which account for more than half of its total membership, have investment policies based on their faith and the values of their religious institutions. These members have a fiduciary obligation to invest in accordance with the principles of their religious denomination, including through shareholder engagement with companies. Shareholder proposals are a critical type of such engagement. ICCR views shareholder proposals as both a fundamental investor right and a critical tool to bring issues of concern to the boards and

management of companies. ICCR members use the shareholder engagement process, including shareholder proposals, to be in dialogue with companies on issues of concern and advocate that companies consider their impact on stakeholders over the long term to build financial success.

14. ICCR members have engaged with publicly traded companies for more than 50 years through dialogue about issues important to their beliefs and in alignment with their fiduciary duties. Although ICCR does not recommend to its members how they should vote on specific shareholder proposals, ICCR's activities are designed to make members aware of shareholder proposals of interest and assist with the shareholder proposal process. As part of those activities, ICCR publishes a proxy book containing all shareholder resolutions ICCR members have filed, disseminates information on shareholder proposals, issues press releases on resolutions deemed important to ICCR membership, and leads webinars where members can provide information to other shareholders about resolutions that they have filed. It also maintains a confidential database accessible only to its members that tracks company engagements and helps to evaluate the impact of those engagements.

15. Plaintiff United Church Funds (UCF) is a 501(c)(3) tax-exempt nonprofit affiliated with the United Church of Christ (UCC). For over 100 years, UCF has served churches and other faith-based nonprofit organizations, helping the faith community steward their financial resources in ways that align with their values. It seeks strong financial performance while advocating for ethical and just corporate behavior, including sustainability. For UCF, its investment work is an extension of its faith-rooted mission to care for creation, uplift human dignity, and ensure that capital serves the common good.

16. UCF provides investment services to over 1,100 local churches, judicatories, denominational ministries, seminaries, and healthcare institutions affiliated with the UCC, as well

as to faith-based organizations beyond the UCC. UCF offers sustainable and responsible investments and maintains funds that enable clients to customize their portfolios according to risk tolerance and return objectives. It has over $1.3 billion in assets under management, held in 11 professionally managed and socially responsible funds.

17.     UCF's investment work is an extension of its faith-rooted mission. Since its founding, the ethical principles of the Christian faith have guided UCF, which believes that responsible investing should be connected to purpose. UCF is committed to seeking a more just and sustainable world and views that work as essential to its mission. As part of its mission, UCF engages in active ownership. It engages with companies in which it invests, votes its shares, files proposals, and works with others (including ICCR) to raise questions about sustainability, governance practices, and more.

18.     UCF clients are unitholders in the organization's pooled funds (not shareholders with voting rights), meaning UCF votes the shares in the pooled funds.[1] Therefore, UCF does not recommend how its clients should vote on specific shareholder proposals. In explaining how UCF has voted its own shares, however, UCF includes analysis that considers a number of social, environmental, and economic issues. In addition, UCF signs investor letters and occasionally files exempt solicitations with the SEC (communications from one shareholder to others) describing how UCF itself has voted or intends to vote on particular proposals.

19.     Plaintiff Ceres is a 501(c)(3) tax-exempt nonprofit advocacy organization working to accelerate the transition to a cleaner, more just, and resilient economy. It makes the business

---

[1] S.B. 2337 defines "shareholder" to include unitholders. *See* Tex. Bus. Orgs. Code Ann. § 6A.001(6) ("'Shareholder' includes a shareholder, unitholder, limited partner, or other equity owner of a company.").

case for taking action on sustainability issues, including climate change, water scarcity, and pollution. As part of its work, Ceres engages with investors and companies to promote its belief that "sustainability is the bottom line." That is, the organization views sustainability as a necessary component of business, and one that is critical to long-term profitability.

20.     Because Ceres believes that sustainability financially impacts investment portfolios and long-term corporate profitability, the organization thinks it is critical that investors and companies address sustainability risks and opportunities as part of their financial analysis. Ceres believes that taking sustainability seriously presents a tremendous business opportunity to drive innovation and economic growth, and that investors and companies are well positioned to help further that innovation and growth.

21.     Ceres thus engages with investors, companies, policymakers, and regulators to build responsible leadership that helps further the idea that sustainability is good for business. That engagement includes, among other things, providing data-driven research on the financial risks and opportunities associated with sustainability issues, supporting investors and companies as they set practical goals, developing transition plans, implementing strategies that boost profitability, and engaging policymakers across the political spectrum to advance market-based sustainability policies.

22.     Defendant Ken Paxton is the Attorney General of Texas, sued here in his official capacity. The Attorney General leads the Consumer Protection Division. He is expressly charged with enforcing SB 2337. *See* S.B. 2337, 89th Leg., R.S., § 6A.201 (Tex. 2025); Tex. Bus. & Com. Code Ann. § 17.47 (West 2025).

**JURISDICTION AND VENUE**

23.     This action arises under 42 U.S.C. §§ 1983 and 1988; 28 U.S.C. §§ 2201-02, and the U.S. Constitution. This Court has subject matter jurisdiction over Plaintiffs' claims under 28 U.S.C. § 1331.

24.     Venue is proper in this District under 28 U.S.C. § 1391(b)(1)–(2). The Texas Attorney General resides in this District for purposes of official-capacity suits, and a substantial part of the events giving rise to the claims occurred in this District.

**FACTUAL ALLEGATIONS**

25.     Purchasing shares of a publicly traded company makes the buyer an owner of the company, even if the ownership is a very small percentage. Equity ownership entitles an investor to vote on matters required by state and federal law, stock exchange listing requirements, and a company's organizational documents. It also confers the right to submit proposals for consideration by fellow shareholders and vote on company and shareholder proposals. Importantly, shareholders may exercise these voting and proposal rights consistent with their investment objectives, values, and beliefs regarding the factors that promote the creation of long-term value.

26.     If a shareholder or group of shareholders wants a company to take some action— say, provide more transparency regarding its spending on lobbying to see if those dollars are consistent with public statements—they can introduce a resolution to do so, subject to certain regulatory limitations. After the resolution is introduced, the proponent can decide to engage with other investors to highlight the proposal or otherwise encourage support. Because institutional investor portfolios include hundreds or thousands of companies, institutional investors often rely on proxy advisors to review the shareholder and management proposals presented for vote and provide guidance according to objectives articulated by those institutional investors.

27.     SB 2337 interferes with shareholder rights, making it harder for shareholders to obtain information from advisors and other investors or sources that would help them vote their shares. As discussed herein, the State's mode of interference—chilling and burdening the speech of proxy advisors—violates the Constitution in several ways.

**The Backdrop Behind Passage of SB 2337**

28.     In advocating for passage of SB 2337, legislators made clear that restricting certain viewpoints and repressing certain voices was the goal of the bill.

29.     SB 2337 was meant to target "activist shareholders who bring resolutions that are opposed by the management of the company," in the words of one of its sponsors. *See* Tex. Senate, Senate Session (Part II) at 1:35:07–1:35:14 (May 8, 2025), https://senate.texas.gov/videoplayer.php?vid=22094&lang=en  (Statement of Sen. Hughes).

30.     The Act also targets firms that—in its sponsor's view—"are basing their advice to clients on factors other than shareholder return, such as in many cases environmental, social, and governance—*political hot button issues*—[and] DEI factors." *See* Tex. H. Comm. on Trade, Workforce & Econ. Dev., Hearing at 1:13:57–14:09 (Apr. 23, 2025), https://house.texas.gov/videos/21855 (statement of Rep. Leach) (emphasis added).

31.     "The point here is to make sure that proxy advisory firms, when they're rendering advice . . . that they're focused on economic factors. So, when they're focused on non-economic-type factors, whether it's ESG, whether it's DEI . . . that's what we want to prevent." Texas H.R., 89th Leg., R.S., Floor Debate on H.B. 4079 (May 27, 2025), at 9:47:36-9:48:25 (video at https://house.texas.gov/videos/22298) (statement of Rep. Leach).

32.     And as Senator Hughes stated in the Texas Senate, "proxy advisory firms have become increasingly political with a hard left bent. . . . Some are basing their advice on ESG standards, other times on DEI priorities." Texas Sen. Comm. on State Affairs, 89th Leg., R.S.,

Debate on S.B. 2337, (Apr. 24, 2025), at 0:58:46-59:27 (statement of Sen. Hughes) (video at https://senate.texas.gov/videoplayer.php?vid=21888&lang=en ).

**The Material Provisions of SB 2337**

33.     To accomplish the goals set out above, SB 2337 imposes burdensome requirements on proxy voting advice that is based in any part on what the Act calls "nonfinancial factors" or "in opposition to company management."

*Counter-factual and Overbroad Definitions and Undefined Terms*

34.     SB 2337 defines a "proxy advisor" as anyone "who, for compensation, provides a proxy advisory service to shareholders of a company or to other persons with authority to vote on behalf of shareholders of a company."

35.     "Compensation" is undefined.

36.     "Proxy advisory service" is defined to include: 1) "advice or a recommendation on how to vote on a proxy proposal or company proposal"; 2) "proxy statement research and analysis regarding a proxy proposal or company proposal"; 3) "a rating or research regarding corporate governance"; or 4) "development of proxy voting recommendations or policies, including establishing default recommendations or policies." As such, "proxy advisory service" is not limited to rendering actual proxy advice.

37.     SB 2337 begins from the premise of protecting the "financial interest of the shareholders," but never defines "financial interest of the shareholders." Nevertheless, SB 2337 exempts from its requirements advice that is "provided solely in the financial interest of the shareholders of a company."

38.     SB 2337 declares that advice based on consideration of "nonfinancial factors" is, by definition of the Act, not provided solely in the financial interest of shareholders of the company. These "nonfinancial factors" specifically include "a commitment, initiative, policy,

target or subjective or value-based standard" based on: "an environmental, social, or governance (ESG) goal, factor, or investment principle; diversity, equity, or inclusion (DEI); a social credit or sustainability factor or score; or membership in or commitment to an organization or group that wholly or partly bases its evaluation or assessment of a company's value over any period on nonfinancial factors." None of these terms are defined.

39. SB 2337 declares that voting recommendations that are "inconsistent with the voting recommendation of the board of directors or a board committee composed on a majority of independent directors" are not provided "solely in the financial interest of the shareholders of the company."

40. For the purpose of determining the scope of SB 2337, the statute also defines "company" and "shareholder." A "company" is a business that was formed in Texas, maintains its principal place of business in Texas, or has made a company proposal to become a Texas entity. A "shareholder" is a person who has any form of equity ownership in a Texas company, regardless of whether the shareholder lives in Texas or is otherwise connected to the state.

### *Compelled Statements About "Nonfinancial" Advice*

41. Proxy advisors whose advice is deemed "not provided solely in the financial interest of shareholders" are compelled to issue a series of warnings to their clients or members and the Texas company that is the subject of their advice, as well as post that warning to their websites. As to the clients or members and the Texas company that is the subject of the advice, the proxy advisor must (1) "conspicuously state[] that the service is not being provided solely in the financial interest of the company's shareholders because it is based wholly or partly on one or more nonfinancial factors"; (2) explain "with particularity" the basis of the advice; and (3) state that "the advice subordinates the financial interests of shareholders to other objectives, including sacrificing investment returns or undertaking additional investment risk to promote one or more

nonfinancial factors." Sec. 6A.101(b)(1). The proxy advisor must also "conspicuously disclose" on the front page of its website that its services "include advice and recommendations that are not based solely on the financial interest of shareholders." Sec. 6A.101(b)(3).

### *Enforcement of the State's Viewpoint*

42.     SB 2337 allows any "affected party" to seek declaratory and injunctive relief. An "affected party" is defined to include "any shareholder" of any Texas company that is the subject of a proxy advisor's advice. Private plaintiffs must "provide notice to the attorney general, who may intervene in the action." S.B. 2337 § 6A.202(b).

43.     Any violation of SB 2337 is deemed a *per se* deceptive trade practice under the Texas Deceptive Trade Practices-Consumer Protection Act (DTPA). SB 2337 explicitly authorizes the Consumer Protection Division of the Office of the Attorney General to seek both injunctive relief and civil penalties, which can be assessed in the amount of "not more than $10,000 per violation" under § 17.47 of the DTPA for violations of SB 2337. SB 2337 allows the Attorney General to seek penalties against organizations that fail to make these disclosures to sophisticated institutional investors.

### The Harmful Impact of SB 2337

44.     SB 2337 is facially unlawful. It violates the First Amendment and is unconstitutionally vague under the due process clause of the Fourteenth Amendment. It will harm Plaintiffs and other organizations like them by depriving them of their constitutional rights.

### *Impermissible Vagueness in Covered Entities and Conduct*

45.     The definition of proxy advisor is vague with regard to any entity other than Glass Lewis or ISS. It is unclear under the language of the Act if any or all Plaintiffs qualify as proxy advisors subject to SB 2337, though both the language of the Act and its legislative history indicate that they very well might.

46. SB 2337 does not define compensation, so it is also unclear whether the word was intended to cover only fee-for-service engagements or if it could encompass membership fees or other payments Plaintiffs receive for the work they do, though they do not receive them for providing "proxy advisory services" specifically.

47. SB 2337 defines "proxy advisory service" and "proxy advisor" so broadly that it may apply to many of the informational services Plaintiffs provide. "Proxy advisory service" is not limited to advice and recommendations regarding specific proxy votes; it includes research, analysis, and generic recommendations and policies. Nor is it clear what constitutes "advice" or "a recommendation."

48. Notably, the Act fails to exclude non-profits, either implicitly or explicitly. Prior to passage, the Texas House adopted an amendment to the Act that would have made the law inapplicable to certain charitable organizations, which the amendment defined to include certain Section 501(c)(3) and Section 501(a) organizations under the Internal Revenue Code. But the Senate did not concur in that amendment, and it does not appear in the text of the Act as passed.

### Impermissible Vagueness in Key Definitions

49. The "financial interest" of shareholders in a single corporation is not uniform. For any publicly traded company, there will be shareholders with a financial interest in short-term gains, shareholders interested in future and long-term performance, and shareholders who are willing to accept short-term reduction in value if they think certain changes in policy, or capital outlays, for example, will lead to long-term success. These interests may be adverse to management or consistent with management plans. SB 2337 fails to account for these complexities, instead adhering to the fiction that there is only one right way to be interested in the success of a company—all without really ever saying what that way is.

50. This presumption infects the Act, which assumes that any proposal that could be labeled "ESG" or "DEI" is bad for business. Not so.

51. Environmental considerations can have a financial impact on company performance. Numerous studies demonstrate how sustainability initiatives and management of climate risk improve financial performance. Financially material climate risk factors encompass both physical and transition risk. As climate change leads to a higher risk of natural disasters like hurricanes, flooding, and wildfires destroying a company's physical assets, that company will have to pay out more to repair the damage (and pay for insurance prior to the damage). As companies adjust to the new realities that climate change causes, they will also have to invest to mitigate harms, such as moving ports used for shipping, adapting to drought and floods, or investing in new technologies that are more climate-change resistant.

52. The risk to investor flows is equally real. Morgan Stanley recently discussed four risks that investors face because of climate change, including physical damage, stranded assets, reputational risk, and pressure on natural resources. *See* Emily Thomas, *4 Ways Investors Can Act on Climate Change*, Morgan Stanley (Oct. 10, 2024), https://perma.cc/XV2E-43YX. Each risk presents an opportunity for investors, such as "investing in companies that support natural resource efficiency, resilient infrastructure, food and water security, and sustainable agriculture." *Id*.

53. And sustainable investing can significantly outperform investing that fails to take sustainability into account. A Morgan Stanley report found that a larger proportion of sustainable funds had positive returns in the first half of 2025, at 92% vs. 85% for traditional funds; ninety percent of sustainable funds have positive returns. *See* Morgan Stanley Institute for Sustainable Investing, *Sustainable Reality: 2025 Report*, https://perma.cc/3MVA-37GQhttps://perma.cc/T9Y6-XLWNhttps://perma.cc/8A3E-ZXPH.3MVA-37GQ. This makes

sense, of course, because companies that consider sustainability can benefit from access to capital, positive brand reputation, and other market-based advantages, while companies that do not address material environmental risks that result from climate change and pollution will face increased costs.

54. Members of Principles for Responsible Investment (PRI), a global organization whose members have approximately 140 trillion dollars in assets under management, recently reaffirmed that they support "incorporating environmental, social and governance factors into their investment and ownership decisions," Principles for Responsible Investment, Home, https://perma.cc/8JPJ-4Y5F (last visited Nov. 10, 2025), and are "deeply committed to the shared goal of responsible investment." Principles for Responsible Investment, *About the PRI*, https://perma.cc/625X-NJAH (last visited Nov. 10, 2025).

55. Social considerations can also have a financial impact on company performance. For instance, labor practices and talent retention, which could be considered "social" factors that fall under SB 2337's ESG rubric, can also directly affect a company's financial performance. And companies that proactively seek to mitigate human rights risks in their operations and supply chains prevent the type of regulatory, legal, financial, and reputational risks that can negatively impact long-term performance.

56. So, too, with governance considerations. Independent board oversight, transparent executive compensation, and robust risk management are all indicators of good governance that can benefit a company's long-term financial outlook. And one example of good governance is reflected in a recent survey, where 79% of corporate directors expressed the belief that board diversity is beneficial to a company, with over 68% believing it leads to better board performance.

*See* Ray Garcia, et al., *PwC's 2024 Annual Corporate Directors Survey* at 4, https://perma.cc/R6NB-VX2A.

57. It is not surprising, then, that the Teacher Retirement Fund of Texas has stated that its Investment Division considers "ESG factors that are material to long-term returns and levels of risk" when making investment decisions. *See* Teacher Ret. Sys. of Tex., *Investment Policy Statement* (June 3, 2025), https://perma.cc/98W4-DV3H. Or that the Texas Employees Retirement System notes that "[i]ntangible factors such as social and environmental issues are increasingly being incorporated into valuation models to better quantify the risks and opportunities of long-term investing in a company." *See* Emps. Ret. Sys. of Tex., *Investment Policy Statement*, add. I, at 3 (Aug. 21, 2024), https://perma.cc/7Y77-23UP.

### *Impermissible Interference with First Amendment Rights*

58. Plaintiffs face a difficult choice: SB 2337 forces them to make statements that they do not agree with, to stop speaking, or to speak knowing that they risk substantial fines and litigation in the form of public and private enforcement.

59. Forcing Plaintiffs to make government-preferred statements that run counter to their own beliefs is compelled speech and violates the First Amendment.

60. As Plaintiff Ceres notes, its entire model is based on proving that "sustainability is the bottom line." Ceres, *About* (last visited Nov. 3, 2025), https://perma.cc/VAA3-W7RN. For Ceres, then, considering ESG factors is solely related to financial interest. ICCR similarly believes that taking environmental, social, and governance factors into account "is integral to long-term value." That is, ignoring these issues is detrimental to a company's value. And UCF believes that its funds deliver long-term growth not in spite of their religious mission, but because of it.

61. Texas can disagree with Plaintiffs' views, but it cannot compel them to give voice to that disagreement without running afoul of the First Amendment, as SB 2337 does.

62.     Complying with the Act's mandated warnings will compel Plaintiffs to speak a message that they believe to be false, including that accounting for certain disfavored factors "subordinates the financial interests of shareholders." The state's mandatory disclosures would also require Plaintiffs to diminish the reliability and utility of their own research and analysis. Disseminating such disclosures would harm Plaintiffs' reputations as trusted sources of information on those very topics the State restricts and will compromise and limit their relationships with their clients and members. Even if Plaintiffs were to moderate the descriptive disclosures required under SB 2337, they would still face other compliance burdens. Compliance with the additional requirements SB 2337 imposes, including the written economic analysis of the financial impact on shareholders of the proposal, would be cumbersome. The personnel required to satisfy these compliance needs are significant, all the more so given that Plaintiffs are non-profits.

63.     If, on the other hand, Plaintiffs refuse to speak Texas's mandated script, Plaintiffs face two unacceptable alternatives. Either they will be forced to be silent on issues in which they strongly believe, or they will face costly investigations, litigation, and fines.

64.     The threat of investigation and prosecution from the Texas Attorney General, should Plaintiffs be deemed proxy advisors under the Act, also adds to the likelihood that Plaintiffs will have to expend additional resources should the Act be allowed to remain in place.

65.     Under all of these scenarios, SB 2337 would prevent Plaintiffs from furthering their mission of aligning investing with beliefs, all because the State of Texas may not like their positions.

### STANDING AND SOVEREIGN IMMUNITY

66.     Each Plaintiff has standing. Chilling and compelling speech, as the Act does, are injuries in fact, even pre-enforcement, that are fairly traceable to the Attorney General. SB 2337

authorizes the Consumer Protection Division of the Office of the Attorney General to bring suit for a violation of the Act under Section 17.47 of the Texas Business and Commerce Code. *See* S.B. 2337 § 6A.201; Tex. Bus. & Com. Code § 17.47. Only a ruling barring SB 2337 from remaining in effect can remove this threat from the Attorney General.

67.     Nor is the Attorney General immune from suit. The Attorney General has both a particular duty to enforce the Act and a demonstrated willingness to do so. Indeed, he has made a variety of statements demonstrating a dislike of proxy advisors, making it almost certain that he will enforce the act absent Court intervention.

68.     The Attorney General sent a letter to ISS and Glass Lewis in 2023, for example, accusing them of violating Texas's "prohibition on unfair or deceptive trade practices" because, in language replicated in SB 2337, Attorney General Paxton believed they were issuing advice "contrary to the financial interest" of shareholders. *See* Letter from Office of the Attorney General of Utah and Office of the Attorney General of Texas to Gary Retelny and Kevin Cameron, at 2 (Jan. 17, 2023) (on file with author), https://perma.cc/85M7-78UC. The Attorney General has also made clear his willingness to use consumer protection laws to attack "a wide range of organizations with which he disagrees politically." *How Ken Paxton Is Stretching The Boundaries Of Consumer Protection Laws to Pursue Political Targets*, Tex. Tribune (May 30, 2024), https://perma.cc/63D5-WQCB. There is no reason to believe that the past is anything but prologue here.

69.     Even after the Court preliminarily enjoined the application of SB 2337 to Glass Lewis and ISS, the Attorney General nevertheless issued Civil Investigative Demands to both companies, presumably as part of a fact-gathering investigation that, on information and belief, is connected to potential suits under S.B. 2337. *See* Texas Attorney General Probes ISS, Glass Lewis

over ESG, DEI, ESG Dive (Sept. 18, 2025, updated Sept. 19, 2025), https://perma.cc/QK5R-9TEQ.

**CLAIMS**

70.    Plaintiffs raise a facial challenge to SB 2337.

**Count I**
**42 U.S.C. § 1983**
**Violation of the First Amendment, as Incorporated Against the States Through the Fourteenth Amendment (Freedom of Speech)**

71.    Plaintiffs incorporate all prior paragraphs as though fully set forth herein.

72.    It is Texas's burden to demonstrate that SB 2337 does not run afoul of the First Amendment guarantee that the government "shall make no law . . . abridging the freedom of speech, or of the press." U.S. Const. amend. I. Texas cannot meet that burden.

*Content Discrimination*

73.    The Act is unconstitutional because it engages in content discrimination and cannot withstand strict scrutiny.

74.    There is no compelling state interest that justifies the law, much less one that is narrowly tailored to serve any compelling state interest.

75.    First, SB 2337's stated goal of "prevent[ing] fraudulent or deceptive acts and practices in this state," S.B. 2337 § 1(4), is mere pretext for regulating disfavored views, rendering the Act's stated interest unlikely to be genuine.

76.    There is no evidence of fraud by proxy advisors that justifies SB 2337, and the State has no genuine interest in combating fraud that does not exist.

77.    Second, the Act fails strict scrutiny even if SB 2337 reflected a genuine interest in preventing fraud because it is not narrowly tailored to serve that interest. It only targets speech about Texas companies rather than speech occurring in Texas or by Texans or to Texans, requires

20

no disclosures for conflicts of interest that could be an indicator of fraud, and has no provisions that regulate advice that aligns with company management. This all suggests that the Act's true purpose has nothing to do with stopping fraud in Texas.

78.     There is nothing inherently fraudulent about the targeted speech, making it impossible to reduce fraud by targeting it.

79.     Nor does the Act's regulatory structure, which forces Plaintiffs and others to disparage the advice they give, use the least restrictive means available to combat the imagined fraud. There is no evidence that any other means were even considered.

80.     The Act discriminates based on the content of speech and is not narrowly tailored to serve a compelling state interest and thus violates the First Amendment.

### Viewpoint Discrimination

81.     Because it subjects only certain speech with a certain viewpoint to rigorous regulation, SB 2337 discriminates based on viewpoint, in violation of the First Amendment. Worse, it compels private speakers to adopt and parrot the government's viewpoint on hotly contested topics and to align with management views.

82.     The Act targets Plaintiffs' particular views. SB 2337 punishes Plaintiffs for taking the view that ESG or DEI factors are relevant to a company's financial performance, but not the opposite view. This is viewpoint discrimination.

83.     The Act also discriminates on viewpoint when it compels Plaintiffs to speak the Texas government's viewpoints, made all the worse because Texas's view contradicts Plaintiffs' beliefs.

84.     The Act compels Plaintiffs to make disparaging disclosures and notices about their own beliefs to their members and clients. S.B. 2337 §§ 101(b), 102(b). It forces Plaintiffs to voice a government-drafted message advocating positions they vehemently oppose. Under the Act,

Plaintiffs are required to convey the State's view that any advice that contemplates "DEI," or "ESG," (however those terms may be construed by the State) is "not being provided solely in the financial interest of the company's shareholders because it is based" on "nonfinancial factors." S.B. 2337 § 6A.101(a). And this disclosure, which Plaintiffs do not believe to be true, must be made "publicly and conspicuously . . . on the home or front page" of their websites. *Id.* § 6A.101(b)(3). In short, Plaintiffs cannot express their views without being compelled under SB 2337 to state the Texas government's preferred views.

85.     SB 2337 also requires these disclosures when proxy advisors encourage or promote any proposal that is opposed by company management. This violates the First Amendment in a particularly skewed manner, mandating that shareholders in corporations toe the line on the positions of management, rather than management being accountable to shareholders through the company's Board.

86.     The Act's viewpoint discrimination is inherent in its design and structure, which compels Plaintiffs to disparage their advice only when they engage in speech deemed "non-financial"—defined as related to ESG, DEI, or a view opposed to management. The purpose of the Act is to slant the public's views in the direction the State wants.

87.     This blatant viewpoint discrimination makes SB 2337 unconstitutional. Texas can view ESG and DEI both as terms and concepts as it wishes. But it cannot force Plaintiffs to express the State's views or regulate their speech because Texas disagrees with their views, at least not without running afoul of the First Amendment.

**Count II**
**42 U.S.C. § 1983**
**Void for Vagueness Under the Fourteenth Amendment**

88.     Plaintiffs incorporate all prior paragraphs as though fully set forth herein.

89.     The Act is unconstitutionally vague, in violation of the Fourteenth Amendment.

90.     It defines "solely in the financial interest of the shareholders," through ipse dixit, to exclude ESG and DEI, terms that are subjective and subject to significant definitional debate. Plaintiffs are forced to guess when their conduct is subject to SB 2337's disclosure requirements, with a wrong guess resulting in steep penalties.

91.     And it is the Texas Attorney General whose subjective view of what ESG and DEI mean, not any objective standard, that will determine whether SB 2337 is enforced. Plaintiffs are thus left guessing not just what the ill-defined law means, but what the Texas Attorney General thinks it means. The double vagueness puts Plaintiffs in an untenable position.

92.     Unless declared unconstitutional, SB 2337 will unlawfully deprive Plaintiffs of their Due Process rights and cause them harm.

## Prayer for Relief

Plaintiffs respectfully request that the Court:

A.  Declare that SB 2337 is unlawful;

B.  Declare that SB 2337 violates the First and Fourteenth Amendments, including the Free Speech Clause;

C.  Declare that SB 2337 is void for vagueness under the Due Process Clause of the Fourteenth Amendment;

D.  Enjoin Ken Paxton, in his official capacity as Attorney General of Texas—and his successors, officers, agents, and employees, including the Consumer Protection Division of the Office of the Attorney General, and all other persons who are in active concert or participation with Paxton—from enforcing SB 2337;

E.  Enter judgment in favor of Plaintiffs;

F.  Award Plaintiffs their reasonable attorneys' fees and costs incurred in bringing this action under 42 U.S.C. § 1988(b) for successful 42 U.S.C. § 1983 claims against state officials; and

G.  Award Plaintiffs all other such relief as the Court deems just and proper.

Respectfully Submitted,

s/ Ketan U. Kharod
Ketan U. Kharod
Texas Bar No. 24027105
Mary Whittle
Texas Bar No. 24033336
Mark Guerrero
Texas Bar No. 24032377
GUERRERO & WHITTLE, PLLC
2905 San Gabriel Street, Suite 309
Austin, TX 78705
(512) 610-2300 phone
ketan@gwjustice.com
mary@gwjustice.com
mark@gwjustice.com

Jennifer Fountain Connolly+
Tsuki Hoshijima+
Victoria S. Nugent+
Skye L. Perryman +
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
Phone: (202) 448-9090
Fax: (202) 796-4426
jconnolly@democracyforward.org
thoshijima@democracyforward.org
vnugent@democracyforward.org
sperryman@democracyforward.org

*Counsel for Plaintiffs*

November 10, 2025

[+] Motion to appear pro hac vice forthcoming